## The Illinois Central Railroad Company

*v.*

### Esther Fitzpatrick, Admx.

*Opinion filed February 21, 1907—Rehearing denied June 18, 1907.*

1. Master and servant—*doctrine of assumed risk not limited to risks contemplated at original hiring.* The doctrine of assumed risk is not limited to those risks in contemplation at the time of the original hiring, but applies also to those which arise or become known to the servant during the service; and in such case the assumption of the risk does not rest wholly upon the contract, but rather upon a waiver, evidenced by the servant continuing in the employment with full knowledge of the danger.

2. Same—*when servant waives all claim to damages.* A servant who, with full knowledge of a danger connected with his place of work or with the appliances with which he is working, voluntarily continues in the employment without complaint or without any promise of the master to remedy the defect, waives all claim to damages resulting from such defect; and in such case it is wholly immaterial that the defect exists as the result of gross negligence on the part of the master.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. A. H. Chetlain, Judge, presiding.

Esther Fitzpatrick, as administratrix of the estate of James T. Fitzpatrick, brought an action of case against the Illinois Central Railroad Company for wrongfully and negligently causing the death of her brother, James T. Fitzpatrick. Plaintiff below recovered a judgment for $5000 in the superior court of Cook county, which has been affirmed by the Appellate Court for the First District. The Illinois Central Railroad Company has prosecuted a further appeal to this court, and seeks a reversal of the judgment on the following grounds: First, because the trial court refused to grant a peremptory instruction requiring the jury to find appellant not guilty; and second, because the court gave erroneous and misleading instructions to the jury.

The declaration, aside from the formal averments, charged that the deceased was in the employ of appellant as switchman, and in the discharge of his duties was obliged to go upon a certain switch track with the engine and cars; that it was the duty of appellant to keep and maintain said switch track in suitable and safe condition and free from obstructions, embankments and posts that would endanger the life of the deceased while engaged in his duties; that appellant neglected this duty and allowed a certain obstruction, embankment and post, of the height of six feet, to be and remain in close proximity to the switching track, so that when the cars passed the same there was only a space of about eight inches between the cars and the said structure, of which appellant had notice, or should have had, and that the deceased was not aware of or informed by appellant of the existence or close proximity of the aforesaid structure or the usual risks and dangers in using the said switch tracks, whereby he was subjected to unusual risks and dangers not contemplated by his contract of employment; that deceased, while discharging his duties in and about the coupling and uncoupling of moving cars or of placing cars upon said track, and exercising due care and caution for his own safety, was, through the negligence aforesaid, caught between the structure aforesaid and one of the cars of appellant and killed. To this declaration a plea of the general issue was interposed.

The material facts, so far as the same are necessary in the determination of the questions here involved, are substantially as follows: Appellant's right of way at the point in question runs north and south. East of the right of way and south of Seventy-fourth street, in the city of Chicago, a foundry building belonging to the Skein and Axle Company is located. This building is enclosed by fences and gates. A private switch belonging to the foundry company runs from the main track of appellant into the foundry yard, which it enters through a gate that was usually locked. The only use

to which this switch was put was to take empty cars in and bring out cars loaded with the products of the foundry, and when any switching was to be done on this track it was necessary to secure the key from the foundry people. Inside the foundry yard the switch track was enclosed on the sides by a dirt embankment about four feet and six inches in height, the top of which was used for loading and unloading scrap or pig iron for use in the foundry. This dirt embankment had a perpendicular face next to the railroad track, and the dirt was held in place by nailing boards to posts four or five inches in size, which were driven in the ground. The distance from the plank attached to the post to the rail of the switch on the side where the injury occurred was about two feet, except at one point, where the pressure of the earth and heavy material placed upon the embankment had caused one post to lean toward the railroad track until the distance between the top of the leaning post and the body of a car standing on the track opposite it was from six to nine inches. The evidence shows that the car which struck the deceased had a platform on the end and a sill that projected out one or two inches further than the side of the car, and a staple driven into the end of the sill, which extended out four inches further and to within a few inches of the top of the leaning post. Deceased was twenty-two years of age and had been employed by appellant as switchman for two weeks, but had been only two days with the crew he was working with on the day of his injury. He had never been required to do any coupling or uncoupling or other work for appellant on the enclosed switch track of the foundry company. Prior to his employment as switchman deceased had been employed by defendant and other railroads as a telegraph operator. The crew with which deceased was working on the day of the injury was composed of John Brennan, foreman, Mike Huber, engineer, George Edmunds, fireman, John Lunney and deceased, switchmen. About four or five o'clock on the afternoon of July 2, 1902, deceased, with the switch-

ing crew above mentioned, went to the foundry yard. The foreman told deceased, before they went to the yard, that he intended to take out all the empties. The engine went in the foundry yard light and coupled onto two box-cars and proceeded further north, where there was a gondola car to couple onto. Deceased walked north about fifty feet along this track, on the east side, before he attempted to make the first coupling. When within about eighteen or twenty feet south from the leaning post he attempted to couple the box-car onto the gondola but failed to make the coupling. The impact moved the gondola car eight or ten feet north, nearer the leaning post. He then went in again, opened the knuckles and gave the engineer the signal to come on. He held the lever with one hand and signaled the engineer to come on with the other. The lever was on the car attached to the engine. He was facing the engine and was four or five feet south of the post. He held the lever until the coupling was made and stepped out. The car moved north a few feet and caught him between the leaning post, inflicting the injury which caused his death.

CALHOUN, LYFORD & SHEEAN, (JOHN G. DRENNAN, of counsel,) for appellant.

HUMMER, MURPHY & McDONALD, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Without entering into any discussion of the evidence, it is manifest from the foregoing statement that the court did not err in refusing to direct a verdict for appellant.

At the instance of appellee the court gave the jury the following instruction:

"The court instructs the jury, as a matter of law, that the risks assumed by the servant of the master are the ordinary and usual risks incident to his employment, and that 'ordinary' and 'usual' risks of his employment include only such

risks as cannot be obviated by the master's employment of a reasonable measure of precaution; and you are further instructed that risks that are unreasonable or extraordinary, or that arise from the master's negligence, are not assumed by the servant."

This instruction lays down the rule that dangers arising from the master's negligence are not assumed by the servant. It is the well settled law in this State that when a servant engages in any employment he does so in view of the usual and ordinary risks incident to it, and he will be presumed to have contracted with reference to such risks, and for an injury received from such incidental and ordinary risks connected with his employment he cannot recover. (2 Cooley on Torts,—3d ed.—p. 1042; 20 Am. & Eng. Ency. of Law,— 2d ed.—109; *Chicago and Eastern Illinois Railroad Co.* v. *Heerey,* 203 Ill. 492.) This doctrine of assumed risk applies as well to those risks which arise or become known to the servant during the service as to those in contemplation at the time of the original hiring. (2 Cooley on Torts,—3d ed. —1044.) "However gross the fault of the master in subjecting the servant to the risk of injury from defective buildings, premises or appliances, yet where the servant knows the defects and dangers, and still, knowingly and without protest, consents to incur the risk to which he is exposed, thereby he is deemed to assume such risk and to waive any claim for damages against his master in case of injury." (2 Cooley on Torts,—3d ed.—1046.) In such case the assumption of the risk does not rest wholly upon the contract of hiring, express or implied, but rather upon a waiver which is evidenced by the servant continuing in the employment with a full knowledge of the danger. In *O'Maley* v. *South Boston Gas Light Co.* 158 Mass. 135, (32 N. E. Rep. 1119,) the supreme judicial court of Massachusetts uses this language: "The doctrine of the assumption of risks of his employment by an employee has usually been considered from the point of view of a contract, express or implied,

but as applied to actions of tort for negligence against an employer it leads up to the broader principle expressed by the maxim, *volenti non fit injuria*. One who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in that respect and leaves each to take such chances as exist in the situation, without a right to claim anything from the other. In such a case there is no actionable negligence on the part of him who is primarily responsible for the danger." In *Drake* v. *Auburn City Railway Co.* 173 N. Y. 466, (66 N. E. Rep. 121,) which is a case in many respects like the case at bar, it is said: "The rule of assumption of obvious risks does not rest wholly upon the implied agreement of the employee, but is an independent act of waiver, evidenced by his continuing in the employment with a full knowledge of all the facts."

Where the servant has knowledge of a danger in connection with the place where he is required to labor or in connection with the appliances with which he is to do his work, and with such knowledge he voluntarily elects to continue in the service without complaint and without any promises of the master to remedy the defect, he must be held to assume the risks from such known defects, and waives all claim, by thus continuing in the employment, to damages resulting to him from such defect. In such case it is wholly immaterial that the defect exists as a result of gross negligence on the part of the master. The instruction under consideration, which told the jury that the servant did not assume the risks arising from the master's negligence is not an accurate statement of the law as applied to the facts in this case. In *Drake* v. *Auburn City Railway Co. supra,* a street car conductor was killed while riding on the running-board of his car, in the discharge of his duty, by being struck on the head by a leaning tree which stood in close proximity to the railroad

track. The evidence showed in that case that the conductor had passed this tree about one hundred and sixty times as conductor and fifty trips as motorman, and it was held, under the above facts, that it was error to submit the question of assumption of risk to the jury, and that it should be determined, as matter of law, that the deceased assumed the risk. The case at bar differs very materially from the *Drake case* as to the opportunities the deceased had for observing and becoming familiar with the dangerous situation, and it therefore cannot be determined in this case, as a matter of law, that the deceased assumed the risk in attempting to make this coupling under the circumstances disclosed by the evidence. It was therefore a question of fact to be determined by the jury, and appellant was entitled to have the question determined under proper instructions. Under the instruction being considered the jury might believe that the deceased assumed the risk, but if they further believed that the danger grew out of the negligence of appellant in operating its cars in dangerous proximity to the leaning post, they would have to conclude that such assumption of risk by the deceased was no bar to recovery. The error in giving this instruction is not cured, if, indeed, it could be, by any other instruction in the series.

Appellant also insists that the court erred in giving instructions numbered 3, 4, 5, 7 and 9. We have carefully considered the several objections of appellant to these instructions and have reached the conclusion that none of them are open to the objections urged against them. But for the error in giving instruction No. 2 the judgment must be reversed and the cause remanded.

*Reversed and remanded.*