Julia A. Ross, Admx., Appellee, *vs.* The Chicago, Rock Island and Pacific Railway Company, Appellant.

*Opinion filed December 22, 1909—Rehearing denied Feb. 4, 1910.*

1. Master and servant—*ordinary dangers incident to service are assumed by contract of employment.* One who enters into an employment which is necessarily in some degree dangerous is held to take the usual and ordinary dangers into consideration in making his contract to work, and for an injury received from such dangers he cannot recover from the master.

2. Same—*a servant may assume unusual danger by remaining in service with notice.* Dangers not ordinarily incident to the employment are assumed by the servant, where, with knowledge of such dangers, he elects to continue in the employment without any promise by the master to remove them.

3. SAME—*burden is upon the plaintiff to show servant did not have knowledge of danger.* In an action to recover damages for the death of a night foreman of a switch crew, due to the absence of a front headlight from the switch engine with which he had been and was then working, the burden is upon the plaintiff to show that the deceased did not have knowledge of such condition of the engine; and this is true whether the character of proof is direct or circumstantial.

4. RAILROADS—*when switchman must be held to have knowledge of a dangerous condition.* A night foreman of a switching crew who worked for a whole night with a switch engine which he then knew had nothing but a switchman's lantern for a front headlight, and who saw the engine, which was in the same condition, when he came to work the next night, must be held to have had knowledge of such unchanged condition, in the absence of any proof whatever that he did not have such knowledge.

5. SAME—*when no recovery can be had for death of a switch foreman.* No recovery can be had for the death of a night foreman of a switching crew, due to the absence of a front headlight from the switch engine with which he was working, where he had worked the whole night before his death with knowledge of such condition and without making complaint or exacting a promise to repair, and continued to work on the next night until the time of the accident knowing that such condition was unchanged.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Rock Island county; the Hon. EMERY C. GRAVES, Judge, presiding.

JACKSON, HURST & STAFFORD, (E. C. LINDLEY, of counsel,) for appellant.

LUDOLPH & REYNOLDS, and J. T. & S. R. KENWORTHY, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Julia A. Ross, as administratrix of her son, George Ross, brought this action to recover damages from the Chicago, Rock Island and Pacific Railway Company for wrongfully and negligently causing the death of her in-

testate. In the trial court the plaintiff recovered a judgment for $7500, which has been affirmed by the Appellate Court for the Second District. The defendant has prosecuted a further appeal to this court.

The evidence, which is not conflicting, tends to establish the following facts: George Ross, the deceased, a single man, was at the time of his death about thirty years old, and was in the employ of appellant, and had been for several years prior thereto, in the capacity of foreman of the switching crew which worked with switch engine No. 156 in the yards of appellant at Rock Island. The yard in which the crew worked is a double yard, composed of two yards adjoining and parallel with each other. They covered a strip of ground extending east and west about fourteen hundred feet long upon the river front in the city of Rock Island, and between two hundred and three hundred feet wide north and south. The main track of appellant's road runs east and west through the center of these grounds. On each side of the main track is a lead track. From the south lead track switch tracks branch off at intervals to the south and west. The south switch yard is known as the Twenty-fourth street yard, while that part of the switch yard north of the main track is known as the Twentieth street yard, and the switch tracks in this part of the yard connect with the lead track at both ends. The deceased, with his crew, worked in the Twentieth street yard with engine No. 156. Charles Ross, a brother of the deceased, was foreman of a crew that worked in the Twenty-fourth street yard with engine No. 106. Each engine, while at work, usually remained in its own yard, yet occasionally they were required to cross over and do some work in the other yard. The duty of the foreman of the switching crew was to hunt up cars on the various switch tracks and give directions to the switching crew what cars to move and where to move them, and to give directions for the loading or unloading of cars and also

in regard to making up trains. A man by the name of Knight was the switchman with the crew of which the deceased was foreman. It was his duty to throw switches and couple and uncouple cars. The foreman also did some work of this character. These switching crews both worked nights. They commenced at six o'clock in the evening and worked until six o'clock in the morning. On the night of March 12, 1905, the crew of which the deceased was foreman went to the round-house, which is located about one mile east of the switch yard, to get the engine to commence work. While near the round-house the evidence shows that the front headlight of engine No. 156 burned out and broke the glass in front of the headlight so that the lamp would not burn. The foreman of the round-house directed that a switchman's lantern showing a white light should be hung beneath the place for the headlight on the engine, and a lantern was so placed and the crew took the engine and proceeded to the yard. The headlight on the rear of the engine was in order. When the engine and crew reached the deceased he asked why they were so late, and was told the headlight had burned out, which caused the delay. The evidence does not show that the deceased made any examination of the engine at that time. Upon being told that the headlight had burned out he walked into the depot. The engine was used all of the night of the 12th in the yards and the deceased was there during that night in the discharge of his duties. On the following night, March 13, engine No. 156 was again sent out from the round-house without a front headlight but with the lantern hanging below the broken glass in the same way that it had been used all the night before. On the night of the 13th the deceased was waiting for the engine at the Twentieth street depot and when it came up he gave the crew some instructions. At the time he gave these instructions he was standing about opposite the middle of the engine. After the orders were delivered the engine

backed up, passing the deceased, and he crossed the track in front of the engine some six or eight feet from the lantern which was hanging on the glass of the headlight. The movements of the engine and crew, including the deceased, from this time until the accident are not detailed very fully by the witnesses, nor do we see that it is important that these movements should be described. About eleven o'clock on the night of the 13th, engine No. 156 had gone in on the side-track for the purpose of bringing out a number of cars that were standing on this track. The deceased was on the rear end of the rear car and was evidently intending to ride out on the car when the engine went out on the main yard track. While engine No. 156 was in on the siding engine No. 106 backed a cut of freight cars down the main track, passing several switches which were closed, and when the switch track upon which engine No. 156 was standing was reached, the cars being moved by engine No. 106 went in on the open switch, resulting in a collision with engine No. 156, and the effect of the impact was to throw the deceased off the rear end of the car and he fell upon the track and was run over, suffering injuries from which he soon afterwards died.

At the close of appellee's evidence, and again at the close of all of the evidence, appellant made a motion for a directed verdict in its favor and submitted an instruction in writing for that purpose. The motion was overruled, and the exception preserved to that ruling is the principal error complained of in this court.

The contention of appellant is, that under the undisputed facts in evidence the injury must, as a matter of law, be held to have resulted from a risk which was assumed by the deceased. The rule of law in reference to assumed risk has been often stated by this court, and the doctrine applies as well to those risks which arise and become known to the servant during the service as to those in contemplation at the time of the original hiring. (2 Cooley

on Torts,—3d ed.—1044.) The usual and ordinary dangers incident to the service are assumed by the contract of hiring. One entering into an employment which is necessarily more or less dangerous is held to take those dangers into consideration in making his contract to work, and for an injury received from such dangers the servant cannot recover. There is, moreover, another class of dangers which the servant assumes, not because they were in contemplation at the time of hiring, but because the servant, having obtained knowledge of the existence of such danger after he is employed, elects to continue without complaint, or promise of his employer to remove the danger after the servant obtains such knowledge. This branch of the rule seems to rest upon a species of waiver, and is expressed by the maxim *volenti non fit injuria.* *O'Maley* v. *South Boston Gas Light Co.* 158 Mass. 135; 32 N. E. Rep. 1119; *Drake* v. *Auburn City Railway Co.* 173 N. Y. 466; 66 N. E. Rep. 121; *Illinois Central Railroad Co.* v. *Fitzpatrick,* 227 Ill. 478.

Under the law as established by the foregoing authorities, and many others that might be cited, it is clear that if the deceased knew that engine No. 156 was being operated without a proper headlight, and he continued to work with said engine without any complaint and without any promise to repair the same and was injured on account of said defective headlight, his so continuing in the service with such knowledge would constitute a waiver on his part of any claim for damages on account of such injury. The whole question on this branch of the case resolves itself into an inquiry as to whether the deceased did have knowledge that the engine was being operated without a sufficient headlight. The burden of proof to show that the deceased did not have such knowledge is upon the appellee. (*Swift Co.* v. *Gaylord,* 229 Ill. 330.) It is not necessary that this proof should be supplied by the direct testimony of witnesses, but it may be established by proof of circum-

stances from which the want of such knowledge may be reasonably and fairly inferred. The nature of the inquiry is such that it would be in most cases impossible, to furnish direct proof, but the rule is well established that whatever the character of proof relied upon may be, the burden is upon the servant to show the absence of such knowledge. It therefore becomes our duty to consider the facts and circumstances in proof relating to the knowledge of the deceased as to the condition of the headlight on his engine.

First, it is to be kept in mind that the deceased was an experienced railroad man and had worked for a number of years in these switch yards. Necessarily he was very familiar with the engine and the other appliances and equipment used in the switch yard. Having worked with the engine at night and become entirely familiar with the appearance of an engine when the headlight was burning, it is incredible that the deceased would not observe the absence of a matter so conspicuous as a headlight on the front of his engine. To our mind the probability that the deceased would take note of the absence of the headlight is much stronger than it would be in the case of a person less acquainted with engines. The evidence is undisputed that on the night before the accident the deceased was told that the headlight had burned out. He knew that the engine had been used all of the night of the 12th with a lantern in the place of a headlight. The evidence is also undisputed that on the night of the accident the deceased was near the engine, that he talked with the other members of his crew, and that he passed in front of the engine within seven or eight feet of the place where the headlight should have been, and thus had an opportunity to see that the headlight had not been repaired and that there was only a lantern, the same as on the night before.

It is contended by the appellee that the deceased had a right to expect that the headlight would be repaired on the

day of the 13th. Granting that this might have been his expectation, still what is more natural or reasonable than that he would notice to see if the headlight had, in fact, been repaired when he saw the engine on the night of the 13th? It seems to us that to hold that the deceased did not have knowledge of the defective headlight is to close our eyes to the reasonable and natural inferences to be drawn from these facts. There is nothing in this record which tends to negative the existence of knowledge of the absence of this light in the deceased. We think that, giving these circumstances their reasonable and ordinary probative force, there is no basis for a finding that the deceased did not know the condition of this headlight. The defect was so open and obvious and the opportunities of the deceased for observing were such that we cannot find that he did not have such knowledge without imputing to him negligence in making use of opportunities afforded which would be equivalent to actual knowledge. (*Armour* v. *Brazeau,* 191 Ill. 117.) The deceased, knowing of the defects and continuing to work with the engine thereafter, must be held to have assumed the risk, and there can be no recovery. (*Cichowicz* v. *International Packing Co.* 206 Ill. 346.) The evidence, together with all reasonable inferences to be drawn therefrom, satisfies us that the deceased knew of the defective condition of the headlight and that he continued in the service after he had such knowledge, from which the conclusion of law necessarily results that the court erred in refusing to direct a verdict for defendant.

The judgments of the Appellate and circuit courts are reversed and the cause remanded.

*Reversed and remanded.*